BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

PUBLIC INTEREST LEGAL FOUNDATION
J. CHRISTIAN ADAMS*
KAYLAN PHILLIPS*
JOSEPH M. NIXON*
JEWEL M. LIGHTFOOT*
CAROLYN C. VALDES*
107 S. West Street
Alexandria, VA 22314
Telephone: (703) 745-5870

*_Pro hac vice_

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCH NOYES, HOLDEN LOMELI, and ANTHONY MCBROOM, | Case No.: 2:25-cv-11480-JLS-WLH-KKL |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, OR OTHER RELIEF** |
| vs. | |
| GAVIN NEWSOM, in his official capacity as Governor of California; and SHIRLEY WEBER in her official capacity as California Secretary of State, | **ACTION SEEKING STATEWIDE RELIEF** |
| Defendants. | Hon. Josephine L. Staton<br>Hon. Kenneth K. Lee<br>Hon. Wesley L. Hsu |

## **FIRST AMENDED COMPLAINT**

Plaintiffs bring this complaint against the California Governor and Secretary of State ("California"), in their official capacities, seeking declaratory and injunctive relief. Plaintiffs rely on John Morgan's Expert Report (*Exh*. 1), John Morgan's Supplemental report (*Exh*. 2), John Morgan's Illustrative Map (*Exh*. 3), and John Morgan's Supplemental Report Annex (*Exh*. 4).

## **INTRODUCTION**

1.     The Proposition 50 congressional map was drawn with illegal racial intent and with illegal racial considerations in violation of the Fifteenth Amendment.

2.     California's 2025 congressional map unconstitutionally draws racial districts in violation of Plaintiffs' civil rights protected by the Fifteenth Amendment to the United States Constitution ("Fifteenth Amendment") and Section 2(a) of the Voting Rights Act of 1965 ("Voting Rights Act").

3.     The Fifteenth Amendment states: "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. amend. XV. California's 2025 congressional map violates this prohibition.

4.     The Voting Rights Act forbids enforcing election procedures enacted with a racial intent or that results in a denial, or abridgment, of the right of any citizen of the United States to vote on account of race. 52 U.S.C. § 10101(a). Drawing district lines to preserve deliberate racial percentages, racial majorities absent a remedial map under the Voting Rights Act, or the deliberate preservation of racial influence districts violates the Constitution and the Voting Rights Act.

5.     By intentionally distorting district boundaries along racial lines to preserve a specific number of Hispanic majority districts and two Black influence districts, California violated the Fifteenth Amendment and Voting Rights Act. *See* U.S. CONST., amend. XV, § 1; 52 U.S.C. § 10101(a); *see also Shaw v. Reno*, 509 U.S. 630, 657 (1993) ("[r]acial gerry-mandering … may balkanize us into competing

1  racial factions; it threatens to carry us further from the goal of a political system in
2  which race no longer matters").

3      6.    Plaintiffs are California residents and voters who were injured when
4  Proposition 50 deliberately enacted district boundaries through racial means and with
5  racial purposes. Plaintiffs will continue to suffer this injury while this electoral map is
6  in place. This injury can only be redressed by this Court finding the map to be a
7  violation of their civil rights. Plaintiffs seek an injunction prohibiting California from
8  using the Proposition 50 map, appropriate damages, and attorneys' fees, expert fees,
9  including litigation expenses and costs, pursuant to 52 U.S.C § 10310(e) and 42
10  U.S.C. § 1988.

11                          **JURISDICTION AND VENUE**

12      7.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§
13  1331 and 1343. This action alleges violations of the United States Constitution and
14  federal civil rights laws, affording jurisdiction under 42 U.S.C. § 1983.

15      8.    This Court has jurisdiction to grant declaratory relief pursuant to 28
16  U.S.C. §§ 2201(a) and 2202.

17      9.    This Court is the appropriate venue under 28 U.S.C. § 1391(b)(2)
18  because California performed a substantial part of the events or omissions giving rise
19  to this claim within this district.

20                                  **PARTIES**

21      10.    Plaintiff Mitch Noyes is a California resident and is registered to vote in
22  California. Under the challenged map, he is assigned to a district drawn with racial
23  intent.

24      11.    Plaintiff Holden Lomeli is a California resident and is registered to vote
25  in California. Under the challenged map, he is assigned to a district drawn with racial
26  intent.

27

28

12.     Plaintiff Anthony McBroom is a California resident and is registered to vote in California. Under the challenged map, he is assigned to a district drawn with racial intent.

13.     Defendant Gavin Newsom is a party to this action due to his official capacity as California Governor. *See* Cal. Const. Art. V, § 1 (mandating the Governor ensure "that the law is faithfully executed").

14.     Defendant Shirley Weber is a party to this action due to her official capacity as California Secretary of State. She is the chief elections officer responsible for implementing Proposition 50's map.

## STANDING

15.     Plaintiffs are registered voters who have voted in past elections and intend to vote in California's 2026, 2028, and 2030 congressional elections. Proposition 50 places Plaintiffs in racially engineered districts. *See North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (plaintiffs can establish a cognizable injury if they have "been placed in their legislative district on the basis of race" and the district court's remedy is to ensure plaintiffs are relieved of the burden of voting in a racially gerrymandered district); *Shaw v. Reno*, 509 U.S. 630, 650 (1993); *see also Miller v. Johnson*, 515 U.S. 900, 911 (1995) (explaining that just as the state may not segregate citizens, on the basis of race, from public parks, buses, golf courses, beaches, and schools, it may not separate its citizens into different voting districts on the basis of race).

16.     Because the congressional map implemented under Proposition 50 was drawn with racial intent, Plaintiffs suffered a constitutional injury. *See Cath. League for Religious and Civ. Rts. v. City & Cnty. of San Francisco,* 624 F.3d 1043, 1052 (9th Cir. 2010) (*en banc*) ("[t]he cause of the plaintiffs' injury here is not speculative: it is the resolution itself"). "[T]he Fifteenth Amendment applies with equal force regardless of the particular racial group targeted by the challenged law." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019).

# FACTUAL AND LEGAL ALLEGATIONS

## **Proposition 50's Enactment**

17.    The Constitution requires states to periodically redistrict. *See* U.S. CONST. art. I, § 2. This process ensures that congressional representatives are distributed relative to the current population. *See Wesberry v. Sanders*, 376 U.S. 1, 8 (1964) ("one man's vote in a congressional election is to be worth as much as another's").

18.    California's Independent Citizens Redistricting Commission implemented a decennial redistricting map following the 2020 Census.

19.    In July 2025, California's Democrat-led legislature ordered a new congressional map. *See* Yes on Prop 50: FAQ, CADEM (Nov. 11, 2025), https://cadem.org/yes-on-proposition-50-faq/.

20.    In early July 2025, Paul Mitchell met with members of the California Legislature. On July 2, 2025, Paul Mitchel met with Speaker of the California Assembly Robert Rivas' Chief of Staff Steve Omara.

21.    The Democratic Congressional Campaign Committee retained Paul Mitchell from Sacramento-based Redistricting Partners to draw a new congressional map, which was submitted to the California Legislature on August 15, 2025. *See* Proposed Congressional Map, California State Assembly Committee on Elections (Nov. 11, 2025), https://aelc.assembly.ca.gov/proposed-congressional-map. The California Legislature passed the legislation package that included Mitchell's map, which became the "Proposition 50 map."

22.    In an interview, Paul Mitchell admitted to drawing district lines with intentional racial goals. When asked about his decision to place new districts in Los Angeles despite net population loss in the city, Paul Mitchell stated: "we've actually gained Latino population, so why would you remove districts from a Latino community that has been historic and has a lot of community of interest arguments in that district. Why take that out when you can just leave it there and let all of the

districts in LA push out over the county area." Rich Ehisen (Host). (2025, August 15). *Mapmaker Paul Mitchell on California's emergency redistricting proposal* [Audio podcast episode 421]. Capitol Weekly. https://capitolweekly.net/mapmaker-paul-mitchell-on-californias-emergency-redistricting-proposal/.

23.    In August 2025, Governor Newsom announced a legislative package that would replace the 2024 map with five more non-competitive Democrat congressional districts. *See* Governor Gavin Newsom, Governor Newsom launches statewide response to Trump rigging Texas' elections, (Nov. 11, 2025), https://www.gov.ca.gov/2025/08/14/governor-newsom-launches-statewide-response-to-trump-rigging-texas-elections/. This legislative package consisted of ACA 8—a constitutional amendment authorizing the new legislature-enacted congressional map, AB 604—the statute detailing the new congressional district boundaries, and SB 280—the bill calling for a special election for the new amendment. *See* Proposed Congressional Map, California State Assembly Committee on Elections (Nov. 11, 2025), https://aelc.assembly.ca.gov/proposed-congressional-map.

24.    On August 18, 2025, the California legislature returned from summer recess. The legislative package that became Proposition 50 underwent its first reading that same day. The legislative package was then debated by the Senate Elections and Constitutional Amendments Committees on August 19, 2025, and passed by the Assembly and Senate Floor Sessions on August 21, 2025. *See* ACA-8 Congressional Redistricting, California Legislative Information (Nov. 25, 2025), https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=202520260ACA8. Due to the compressed timeline, Senator David Tangipa noted in his opposition to ACA 8's passage that he did not have the opportunity to read the bill. In response, the bill's co-author, Senator Marc Berman, stated that he knew the general content and trusted the people who drafted ACA 8. *See* August 19, 2025 Hearing, California State Assembly Committee on Elections (Nov. 11, 2025), https://www.assembly.ca.gov/media/assembly-elections-committee-20250819.

25.     On November 4, 2025, Proposition 50 was passed in a special election by California voters, receiving 7,428,420 affirmative votes. *See* Proposition 50 Congressional Redistricting, California Statewide Special Election, https://electionresults.sos.ca.gov/returns/maps/ballot-measures/prop/50 (last visited November 21, 2025).

### Statements of Racial Intent

26.     This Court's order denying a preliminary injunction in *Tangipa v. Newsom* (Case No. 2:25-cv-10616) cites numerous admissions, legislative debate statements, and legislative press releases indicating that a racial outcome motivated the drawing of Proposition 50's lines. This evidence that this Court deemed to be preliminary or peripheral to the voter's intent reflects racial motives by Paul Mitchell and the California legislature. *See Cooper v. Harris*, 581 U.S. 285, 318 (2017) (direct evidence of legislative intent includes statements of legislators going to the legislative purpose). To advance support for Proposition 50 to ameliorate Texas' redistricting, legislative statements include:

- Assemblyman Isaac Bryan stated that the Republican-led states were redrawing their congressional districts "with the explicit aim of diluting Black and Brown representation and power." *Tangipa*, ECF No. 216, "*Order Denying Plaintiffs' Motion for Preliminary Injunction*," at 25 (citing CA Assembly Appropriations Comm. Tr., Ex. 7 at 681, Doc. 188-9). He also said, "a Latino voice in Texas is worth one third of the representation as a white voice. A Black voter in Texas is worth one fifth of the representation of a white voter in Texas. I didn't say three fifths. There was no compromise. I said one fifth. That is the kind of gerrymandering, that is the kind of theft that they are perpetuating. And we can't just sit by and let it happen." *Id.* at 26, n. 10 (citing CA Assembly Floor Tr. at 1071).

- Assemblyman Mark Gonzalez promoted Proposition 50 as a shield against the racist maps created by the Republican states. *Id.* at 26 (citing CA Assembly Floor Tr. at 1062). Mr. Gonzalez also stated, "[t]his is about whether a Latino child in Texas, a Black family in Florida, or an immigration community in California has a voice in their own democracy." *Id.* at 26, n. 10 (citing CA Assembly Floor Tr. at 1062).

- Assemblyman Mike Gibson stated, "it's about the next generation that we may not even have any Black people serving in office to have representation. It's about ten African American members of Congress that could be wiped away in Congress if we don't stand up and be counted." *Id.* (citing CA Assembly Floor Tr. at 1075).

- Senator Sabrina Cervantes, the author of Senate Bill 280, stated, "they want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters." *Id.* (citing CA Assembly Elections Comm. Tr., Ex. 5 at 341, Doc. 188-9).

- Senator Lola Smallwood-Cuevas stated, "in Texas, what this looks like is that Black Texans will lose much of their power, being reduced to about a fifth of what their power was before this gross attack." *Id.* at 26. (citing CA Senate Tr. at 909). She also said, "Texas once saw Black political power rise during reconstruction, as it had across much of the country, only to be stripped away by the Black codes, and Jim Crow, and racial terror, poll taxes, white-only primaries that cut Black voter rolls in Texas from over 10,000 to just a few thousand." *Id.* (citing CA Senate Tr. at 910-11).

- Senate pro tempore Mike McGuire said that Proposition 50 "makes no changes to historic Black districts in Oakland and the Los Angeles area and retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice." *Id.* at 27 (citing

McGuire Press Release from August 19, 2025, Ex. 21 at 1491-92, Doc. 188-9).

- Senate Majority Leder Lena Gonzalez asked her opposition colleague, "why have you remained silent during this egregious overreach when Latino communities across California have been kidnapped?" *Id.* at 91 (Lee, J. dissenting) (citing Senate Floor Debate, Aug. 21, 2025, Ex. 8 at 99).

- The Speaker of the Assembly Robert Rivas issued a press release asserting that the Proposition 50 map "retains both historic Black districts and Latino-majority districts." *Id.* at 28 (citing *Tangipa* Ex. 20, at 1).

- Senator Aisha Wahab described the Voting Rights Act as "mandating that voters of color be placed in districts with more opportunity to select their preferred candidates." *Id.* at 92 (Lee, J. dissenting) (citing Senate Floor Debate, Aug. 21, 2025, Ex. 8 at 172).

This Court's opinion in *Tangipa* is similarly littered with statements by Paul Mitchell, indicating an expressed intent to sort populations to maximize the power of Latino Californians. This includes:

- In a Hispanics Organized for Policial Equity (HOPE) Presentation, he stated, "the Proposition 50 maps I think will be great for the Latino community" as "they ensure that the Latino districts" are "bolstered in order to make them most effective, particularly in the Central Valley. *Id.* at 41 (citing Atlas of Prop. 50 Maps, Ex. 190).

- Paul Mitchell also stated that the "number one thing" that he "started thinking about" was creating a "[replacement] Latino majority" district in Los Angeles. *Id.* at 42, n. 17 (citing HOPE Presentation at 1376-77).

- In his HOPE presentation, Paul Mitchell identified "Latino-influenced" districts and highlighted the importance of "support[ing] and do[ing]

turnout there for Latinos to protect a Latino member of Congress in a district that is still a Latino-influenced district but is no longer a majority-minority district." *Id.* at 84 (Lee, J. dissenting) (citing Paul Mitchell statement on HOPE Zoom meeting, Ex. 11, at 29).

- On X/Twitter, Paul Mitchell stated that the "proposed Proposition 50 map will further increase Latino voting power" and "adds on more Latino influence district." *Id.* at 71 (Lee, J., dissenting) (citing *Tangipa* Ex. 14).

- Redistricting Partners provided an atlas of district maps to the legislators providing census population tables and CVAP in each district broken down by race, as well as bar graphs of each district's racial composition. No political affiliation associated with any racial group was included. *Id.* at 93 (Lee, J. dissenting) (citing *Tangipa* Ex. 190).

**Application of Race Based Redistricting Lines**

27.    While Proposition 50 will likely reduce California's Republican delegation from nine to four members, these new district lines were drawn with racial goals and using racial means. The map deliberately preserved California's sixteen Hispanic majority districts by narrowing the margin of Hispanic population in all but District 44. *See Exh.* 1, "Declaration of John Morgan," at 3-4, ¶ 10.

28.    These new districts also intentionally maintained Black racial representation and influence in two non-Hispanic majority districts. *See Exh.* 1, at 3-4, ¶ 10. This enabled racial groups to maintain a narrow majority in these two districts. *See Exh.* 1, at 4, ¶ 11.

29.    California's racially motivated and racially drawn districts violate the Fifteenth Amendment's prohibition of state action for which **any** racially discriminatory intent or racial means are used, even to gain political or partisan advantage. *See* U.S. CONST. amend. XV. The intent standard of the Fifteenth Amendment is violated by actions taken with the intent of effectuating a racial

1  outcome or using race as a tool to accomplish a particular aim. *See e.g., Garza v.*

2  *Cnty. of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring and

3  dissenting in part). Under the Fifteenth Amendment, "all citizens, regardless of race,

4  have an interest in selecting officials who make policies on their behalf." *Rice v.*

5  *Cayetano*, 528 U.S. 495, 523 (2000) (holding that, under the Fifteenth Amendment,

6  "voters are treated not as members of a distinct race but as members of the whole

7  citizenry").

8      30.    Defendants are constitutionally prohibited from intentionally racially

9  discriminating against "voters in elections to determine public governmental policies

10 or to select public officials, national, state, or local." *Terry v. Adams*, 345 U.S. 461,

11 467 (1953); *see also Rice v. Cayetano*, 528 U.S. 495, 512 (2000) (the Fifteenth

12 Amendment "grants protection to all persons, not just members of a particular race").

13 This "prohibition on race-based voting restrictions is both fundamental and absolute."

14 *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019).

15     31.    Even facially neutral election procedures violate the Fifteenth

16 Amendment if they are adopted with a racially discriminatory purpose. *See Reno v.*

17 *Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997). "Racial discrimination need only

18 be one purpose, and not even a primary purpose, of an official act" to violate the

19 prohibition on election procedures enacted with racially discriminatory intent.

20 *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984) (citing *Arlington*

21 *Heights v. Metro. Dev. Hous. Corp.*, 429 U.S. 252, 265 (1977)).

22     32.    The Fifteenth Amendment's race neutrality requirement restrains

23 California's authority to draw its congressional districts. *Rice v. Cayetano*, 528 U.S.

24 495, 522 (2000); *see also Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960) (declining

25 to sanction "the achievement by a State of any impairment of voting rights [] so long

26 as it was cloaked in the garb of the realignment of political subdivisions"). A claim

27 under the Fifteenth Amendment is distinct from claims brought under the Fourteenth

28 Amendment. "Unlike the Fourteenth Amendment[], there is no room for a compelling

1  state interest defense, as the Fifteenth Amendment's prohibition is absolute." *Prejean*
2  *v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000).

3      33.    Racial gerrymandering—deliberately drawing district boundaries for
4  racial purposes and with racial means —circumvents the Fifteenth Amendment. *Shaw*
5  *v. Reno*, 509 U.S. 630, 640 (1993).

6  ## I.    Evidence of Racial Intent: Passing the Hispanic Population Between
7  Districts

8      34.    In California's effort to preserve sixteen Hispanic majority Districts, the
9  State engaged in a deliberate practice of passing Hispanic majority census blocks
10 from one adjacent district to another to preserve the number of Hispanic majority
11 congressional districts. This was achieved by reducing Hispanic population with
12 precision in many districts, but at a level that very carefully and deliberately
13 maintained a floor of 52% Hispanic population. This "pass the population" resulted in
14 many Hispanic majority districts falling in a tight, narrow, and implausible band of
15 52-55% Hispanic population in the 2025 map. This is implausible without a
16 deliberate racially motivated draw using explicit racial means.

17      35.    As Judge Lee noted, this can be explained by the 2021 letter from HOPE
18 to the redistricting commission warning against "overpacked" districts with too
19 highly concentrated Latino populations. *Tangipa* ECF No. 216, at 83 (Lee, J.
20 dissenting) (citing Paul Mitchell statement on HOPE Zoom meeting, Ex. 11, at 4). The
21 letter advocated, for maximum electoral effect, drawing districts "between 52% and
22 54% Latino CVAP" which would "still be very likely to elect Latino candidates of
23 choice." *Id.* It also stated that "the protection of voters of color is a higher priority
24 than preserving county boundaries or other lower-order criteria" and that "it is also
25 acceptable for [map drawers] to value providing influence to voters of color in [their]
26 district plans, so long as it is not the sole criteria used." *Id.*

27      36.    California's map violates the Fifteenth Amendment by packing Hispanic
28 and Black voters into districts in such a way to preserve the number of Hispanic

majority districts at a precise set number, as well as maintaining two Black influence districts—maximizing the voting strength of these racial minorities. *See Exh.* 1, at 59, ¶ 150. This achieved the intended racially motivated outcome of preserving 16 majority Hispanic citizen voting-age population (CVAP) Districts but narrowing this majority to a tight range between 52-55% Hispanic population in these districts. *See Exh.* 1, at 58-59, ¶ 147 and Table 1 below. The map also violates the Fifteenth Amendment by maintaining two Black influence districts by deliberately steering Hispanic populations away from these two districts and placing it in non-compact, adjacent, Hispanic majority districts. *See Exh.* 1, at 59, ¶ 148.

Table 1 – Distribution of majority Hispanic CVAP districts

| 2025 Newsome Plan | | | | 2024 Enacted Plan | | |
|---|---|---|---|---|---|---|
| Hispanic CVAP | Number of Districts | Districts | | Hispanic CVAP | Number of Districts | Districts |
| Over 61% | 2 | 22, 44 | | Over 61% | 1 | 22 |
| 58% to 61% | 0 | - | | 58% to 61% | 1 | 35 |
| 55% to 58% | 0 | - | | 55% to 58% | 7 | 42, 33, 31, 29, 38, 25, 31 |
| 52% to 55% | 13 | 41, 34, 33, 39, 31, 13, 29, 35, 38, 18, 46, 25, 31 | | 52% to 55% | 7 | 44, 34, 39, 13, 18, 46, 52 |
| Under 52% | 1 | 52 | | Under 52% | 0 | 52 |

37.    Majority Hispanic District 18 lost 57.5% Hispanic CVAP territory to District 16 and 57.5% Hispanic CVAP territory to District 17. *See Exh.* 1, at 10, ¶ 28. California was able to preserve District 18 as a majority Hispanic CVAP district (changing from 52.4% to 52.5%) through carefully selected population transfers from the adjacent Districts 13 and 22 (also Majority Hispanic districts in both maps). *See Exh.* 1, at 8-9, ¶ 25.

38.    District 18 was able to achieve this consistency by absorbing a 51.4% Hispanic CVAP territory from District 13 and a 70.8% Hispanic CVAP from District

22. *See Exh.* 1, at 8-9, ¶ 25. This contributed to offsetting District 18's receipt of 25.4% Hispanic CVAP territory from District 16 and 14.6% Hispanic CVAP territory from District 17. *See Exh.* 1, at 9, ¶ 26.

39.    These deliberate swaps of racial population enabled District 18 to remain within the deliberately tight band of 52-55% Hispanic CVAP range. *See Exh.* 1, at 11, ¶ 30. Despite substantial changes in territory, District 18's Hispanic CVAP population remained consistent between 2024 and 2025. California moved high concentrations of Hispanic CVAP territory into District 18 to offset its losses of high Hispanic CVAP territory. Otherwise, District 18 might not have remained majority Hispanic in 2025. *See Exh.* 1, at 11, ¶ 31.

## II.    Evidence of Racial Intent: Replacing District 42 with District 41

40.    Districts 42 and 41 demonstrate the intent of the map drawer to preserve districts to maintain racial outcomes. Though District 42 transitioned from a Hispanic majority district to a non-Hispanic majority district, District 41 was drawn deliberately to preserve a racial outcome and replace this Hispanic majority district. The new District 42 is effectively dismantled (rendering it no longer a majority Hispanic CVAP district) and was replaced in the same geographic area by a new District 41, which is now within the 52-55% Hispanic CVAP range. *See Exh.* 1, at 24-25, ¶ 68-69. District 42 changed its racial composition by discarding a heavily Hispanic area to the north. That population was divided between District 38 and the new District 41. *See Exh.* 1, at 24-25, ¶ 69. This change enabled District 41 to effectively replace District 42.

41.    Despite District 42 losing a substantial portion of its Hispanic population, this Hispanic majority area was left intact and formed the core of a new Hispanic majority District 41, preserving the number of majority Hispanic CVAP districts at sixteen.

42.    Under the 2025 Map, Districts 41 and 42 were completely relocated. Despite being moved elsewhere in the State with a new constituent population, those

districts were drawn to deliberately maintain the same proportion of Hispanic population. *See Exh.* 1, at 24-30.

43.   Similarly, Republican District 48 lost territory to three Democrat districts. District 52 (a Hispanic majority district) only absorbed just enough territory from District 48 to have its Hispanic CVAP population change from 52.0% to 51.7%, preserving its narrow Hispanic majority. *See Exh.* 1, at 18-19, ¶ 50.

44.   When evaluating the Hispanic CVAP majority districts in Proposition 50's new map, most of the districts not only retained their Hispanic majority status but maintain similar racial compositions as they had under the previous map.

45.   The racial population in the new map demonstrates a carefully and intentionally crafted racial outcome.  Despite having altogether new lines, nine of the sixteen majority Hispanic CVAP districts are precisely within 2% of their 2024 percentages, and all but one remained above 52% Hispanic CVAP despite substantial changes to the congressional boundaries' location. *See Exh.* 1, at 20, ¶ 55. Two districts' Hispanic CVAP changed within 4%, two changed within 6%, and one changed by 9% (District 44 increased to 62% Hispanic CVAP), however, none of the districts that changed by 4% or 6% had their Hispanic CVAP drop below 52%. *See Exh.* 1, at 7, ¶ 20. This is not a coincidence. It is a deliberately racially engineered outcome.

46.   The new District 38 remained majority Hispanic (52.5%) despite being moved west because it absorbed part of the former Districts 42 and 31. If these components had not been merged into District 38, it likely would not have remained majority Hispanic. *See Exh.* 1, at 42, ¶ 109.

47.   Despite substantial geographic changes between the 2024 and 2025 maps, two majority Hispanic Districts (38 and 42) were effectively reconfigured into the new Districts 38 and 41 to retain their majority Hispanic status. *See Exh.* 1, at 24-44. Proposition 50 not only replaced District 42 with 41 but retained almost the exact same Hispanic CVAP percentage in each district. *See Exh.* 1, at 31, ¶ 85.

### III.    Evidence of Racial Intent: Deliberately Preserving Two Black Influence Districts

48.    In addition to the deliberate maintenance of sixteen Hispanic majority districts, Proposition 50 deliberately preserved two performing Black influence districts. These two districts avoided placing too much Hispanic population to not jeopardize their status as Black-performing districts.

49.    Districts 37 and 43 lie side-by-side, have the highest portion of Black population in any district in California, and are not majority Hispanic. *See Exh*. 1, at 48-49, ¶ 129. Rather than making a new majority Black or majority Hispanic district, California deliberately preserved the Black populations' proportion in both districts and did not mix them with the surrounding Hispanic population. *See Exh*. 1, at 49-50, ¶ 133. Districts 37 and 43 were deliberately drawn in such a way as to preserve the proportion of the Black population and its ability to elect candidates based on race. *See Exh.* 1, 50, ¶ 134-35. As Map 1 shows, District 44 was drawn to avoid taking any Hispanic population from District 43 that would upset the ability to elect Black preferred candidates.

Map 1 – Black Influence Districts 37 and 43



FIRST AMENDED COMPLAINT

50.    No racial groups' CVAP populations in Districts 43 and 37 changed. Neighboring Hispanic majority Districts 33, 38, 44 and White majority District 40 all experienced demographic changes. *See Exh*. 1, at 59, ¶ 148. Maintaining Districts 43 and 37 is evidence of California's racial intent in drawing the map.

51.    Maps 2 and 3 show that the Black and Hispanic populations are divided in such a way that neither group is the majority of the citizen voting-age population in either district.  However, the voter registration data in the census block groups show that the higher concentration of Hispanic population has lower registration as a percentage of voting age population. *See Exh*. 1, at 57, ¶ 144. This demonstrates that the Black population has an increased voting strength relative to the Hispanic population in both districts, providing the Black population with an advantage. *See Exh*. 1, at 57, ¶ 144.

52.    Maintaining Black racial targets in Districts 43 and 37 enables the Black population to maintain Black influence districts. *See Exh*. 1, at 50, ¶ 135. As Map 2 demonstrates, the Hispanic population in this area has lower registration as a percentage of VAP. This supports the fact that the Hispanic population in California has a lower citizenship rate than the Black population. This enables the Black populations in Districts 43 and 37 to effectively politically control the districts despite lacking any majority or plurality in the census data. *See Exh*. 1, at 57, ¶ 145. By intentionally walling off surrounding Hispanic and White racial populations, California deliberately and illegally created two Black influence districts. *See Exh*. 1, at 50, ¶ 135. The consequence of blocking Hispanic populations from entering these two districts was shown in the increase of Hispanic population in neighboring District 44. *See Exh*. 1, at 61, ¶ 155.

Map 2 – Illustrative community map with Districts 37 and 43 (NH Black and Hispanic VAP)



53.    Map 2 shows the Hispanic and non-Hispanic Black voting-age population (VAP) and uses triangles to represent the Hispanic population and circles for the Black population.

54.    The larger circles indicate 50% or more non-Hispanic Black VAP, and the smaller circles indicate between 40% and 50% Black VAP. *See Exh*. 1, at 55, ¶ 142.

55.    The triangles show the strength of the Hispanic community with the larger triangles indicating over 50% Hispanic VAP and the smaller triangles indicating between 40% and 50% Hispanic VAP. *See Exh*. 1, at 55, ¶ 143.

Map 3 – Illustrative community map with Districts 37 and 43 (Registration as % of VAP)



FIRST AMENDED COMPLAINT

56.     By deliberately concentrating the Black population in two districts with low Hispanic registration percentages, while walling off the Hispanic and White populations to the surrounding districts, California preserved two influence districts for the Black population. California intentionally drew district lines to advance political control of one racial group over another to the detriment of the Fifteenth Amendment and the Voting Rights Act.

## CLAIMS FOR RELIEF

## Count I. Violation of the Fifteenth Amendment.

57.     Plaintiffs reallege, as though fully set forth in this paragraph, all the preceding allegations of this Complaint.

58.     The Defendants acted under color of state law to deprive Plaintiffs of rights secured by the Fifteenth Amendment, the Voting Rights Act, and 42 U.S.C. § 1983.

59.     The Fifteenth Amendment prohibits drawing congressional maps with any racial intent, goal, or purpose.

60.     Map drawers in California intentionally used race to draw district lines in contravention of the Fifteenth Amendment. This is evidenced, in part, by:

- The intentional preservation of Hispanic majorities in precisely 16 districts (despite carefully lowering the percentage);

- The implausibly tight range (52% to 55%) of Hispanic population in the resulting districts; and,

- The deliberate allocation of Black population in Districts 37 and 43 and careful avoidance of adding White and Hispanic population to preserve these two racial influence districts to guarantee electoral outcomes based on race.

California's intentional distortion of district boundaries for racial purposes violates Plaintiffs' Fifteenth Amendment rights.

61.    The use of race abridged and/or denied the Plaintiffs' right to vote because the Defendants intentionally sought to separate voters by race.

62.    The effect of the districting plan of the Defendants was to intentionally give greater value to the votes of some racial groups, thereby discounting the value of votes of those groups not benefited.

**Count II. Violation of Section 2(a) of the Voting Rights Act.**

63.    Plaintiffs reallege, as though fully set forth in this paragraph, all the preceding allegations of this Complaint.

64.    Section 2(a) of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

65.    A violation of Section 2(a) of the Voting Rights Act may be based upon the finding of a discriminatory purpose alone, which can be established by proof that race was a motivating factor in the decision to draw California's congressional map. *See Rice v. Cayetano*, 528 U.S. 495 (2000). California cannot enforce any voting qualification or prerequisite to voting or any standard, practice, or procedure that has any purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group. Proposition 50's map was drawn with this intent.

66.    By deliberately ensuring that the Hispanic population maintains a slight majority in all 16 previously Hispanic majority districts and ensuring the two Black influence districts (Districts 37 and 43) were untouched, California's boundaries disperse the non-Hispanic population into districts in which they will remain an ineffective minority. In doing this, California intentionally concentrated Hispanic and Black populations into districts where they either constitute a slight majority or enjoy an influence district, violating Section 2(a) of the Voting Rights Act.

67.    Defendants acted under color of California law to engage in discrimination based on race, color, and/or national origin in violation of: (1) Section 2(a) of the Voting Rights Act; and (2) the Fifteenth Amendment to the United States Constitution, which can be enforced through 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for entry of a judgment:

68.    Declaring that Proposition 50's map violates the prohibitions on discriminatory purpose contained in the Fifteenth Amendment to the United States Constitution and Section 2(a) of the Voting Rights Act;

69.    Declaring that Proposition 50 was adopted with an impermissible racial intent in violation of the guarantee of the Fifteenth Amendment to the United States Constitution and Section 2(a) of the Voting Rights Act;

70.    An order enjoining Defendants from enacting or implementing the map contained in Proposition 50;

71.    Ordering the Defendants pay Plaintiffs' reasonable attorney's fees, expert fees, including litigation expenses and costs, pursuant to 52 U.S.C § 10310(e);

72.    Ordering the Defendants pay Plaintiffs' reasonable attorney's fees including litigation expenses and costs, pursuant to 42 U.S.C. § 1988 and any other applicable law;

73.    Granting Plaintiffs such further relief the Court deems just and proper including all other injunctive relief available to the Court.

1 | February 27, 2026

BENBROOK LAW GROUP, PC
 */s/ Bradley Benbrook*

2

Bradley A. Benbrook
Stephen M. Duvernay

3

4

PUBLIC INTEREST LEGAL
FOUNDATION

5

J. Christian Adams

6

Kaylan Phillips

Joseph M. Nixon

7

Jewel M. Lightfoot

8

Carolyn C. Valdes

9

*Attorneys for the Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT